**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SEQUENTIAL BRANDS GROUP, INC., *et al.*,[1] | Case No. 21-11194 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF LORRAINE DISANTO IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Lorraine DiSanto, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Chief Financial Officer of Sequential Brands Group, Inc. ("Sequential"), a debtor and debtor in possession and the main holding company of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors" or the "Company"). In this capacity, I am familiar with the Debtors' business, financial affairs, and day-to-day operations.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Sequential Brands Group, Inc. (2789), SQBG, Inc. (9546), Sequential Licensing, Inc. (7108), William Rast Licensing, LLC (4304), Heeling Sports Limited (0479), Brand Matter, LLC (1258), SBG FM, LLC (8013), Galaxy Brands LLC (9583), The Basketball Marketing Company, Inc. (7003), American Sporting Goods Corporation (1696), LNT Brands LLC (3923), Joe's Holdings LLC (3085), Gaiam Brand Holdco, LLC (1581), Gaiam Americas, Inc. (8894), SBG-Gaiam Holdings, LLC (8923), SBG Universe Brands, LLC (4322), and GBT Promotions LLC (7003). The Debtors' corporate headquarters and the mailing address for each Debtor is 1407 Broadway, 38th Floor, New York, NY 10018.

3.　　　I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of the Debtors' business and these chapter 11 cases (the "Chapter 11 Cases") and to support the Debtors' applications and motions for "first day" relief (collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and board of directors (the "Board of Directors"), and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  To the extent that any information provided herein is materially inaccurate, we will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.　　　In addition to providing the factual support for the First Day Motions, the primary purpose of this First Day Declaration is to familiarize the Court with the Debtors, the Chapter 11 Cases and the relief sought in the First Day Motions.  This First Day Declaration is organized as follows:

- **Part I** provides an introduction and overview of the Chapter 11 Cases;

- **Part II** describes the Debtors' business operations;

- **Part III** describes the Debtors' corporate and capital structure;

- **Part IV** describes the events leading up to the commencement of the Chapter 11 Cases; and

- **Part V** sets forth my basis for testifying to the facts underlying and described in each of the First Day Motions.

5.     The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.  As set forth in Part VI, concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

## I.     Introduction and Overview of the Chapter 11 Cases

6.     The Debtors own, manage and license a large-scale and diversified portfolio of consumer brands across multiple sectors.  The Debtors' business is to maximize the strategic value of their brands by promoting, marketing, and licensing these brands through various distribution channels, including to retailers, wholesalers and distributors in the United States and in certain international territories.  The Company's core strategy (i.e., a focus on licensing its brands to operating partners) allows it to avoid inventory and other typical operational risks associated with the sale of consumer branded products.

7.     As described in more detail below, in the fall of 2019, with revenue down compared to prior years, and with the Company receiving unsolicited inbound interest from third parties for the purchase of certain of its assets, the Company began to consider undertaking a broad strategic review focused on maximizing value.  In early October 2019, the Company formally announced that it had initiated a review process and had engaged outside advisor Stifel, Nicolaus & Co., Inc. ("Stifel") to assist with performing this strategic review.

8.     By November 2019, the Company determined to explore a sale of the Company's activewear division assets.  The formal sale process, however, was launched in the first week of March 2020, just as the World Health Organization was declaring the outbreak of COVID-19 a global pandemic.  In addition to affecting the Company from an operational standpoint, the COVID-19 pandemic partially disrupted the Company's ability to fully market its assets. Nevertheless, the Company continued to explore the sale of its assets, while also undertaking an evaluation of all of the Company's brands and the potential to engage in a variety of value-maximizing transactions.  This included pursuing multiple business combination transactions and other value-maximizing alternatives.

9.     By the fourth quarter of 2020, in light of a continuing decline in revenues, including related to disruption from the COVID-19 pandemic, the Company was close to breaching certain financial covenants under its second lien credit agreement, the Wilmington Credit Agreement (as defined below).  In November 2020, the Company entered into a temporary waiver of certain events of default under the Wilmington Credit Agreement and, in conjunction therewith, relaunched a broad strategic alternatives process to best position the Company to maximize the value of its assets given the Company's financial position and its view that it would be unable to comply with the financial covenants under the Wilmington Credit Agreement in the next twelve months.

10.     In late 2020 and early 2021, the Company, with assistance and advice from Stifel, engaged in a broad marketing process for the sale of the Company or the divestiture of one or more existing brands, while also evaluating all other potential transactions, including raising new debt and/or equity financing.  As the Company worked through this marketing process with numerous parties, it continued to be in default of certain covenants under the Wilmington Credit Agreement

and, in April and June of 2021, defaulted under certain covenants under its first lien credit agreement, the BoA Credit Agreement (as defined and described in further detail below) necessitating that the Company enter into multiple waiver agreements.

11.    Against the backdrop of operating under temporary waivers of events of default under both the Wilmington Credit Agreement and the BoA Credit Agreement (as described in more detail below), the Company continued to work to identify value-maximizing transactions, including the sale of assets, potential financing transactions, or other strategic alternatives that offered the Company the best path towards maximizing value for all of the Company's stakeholders.  Indeed, as described in more detail below, the Company was able to consummate a number of value-maximizing brand sales over the months prior to the Petition Date that helped to pay down debt.

12.    Ultimately, as described herein, the Company was able to enter into a number of transactions that help set the stage for these Chapter 11 Cases.  More specifically, the Company has (i) entered into that certain restructuring support agreement ("RSA") with the lenders under the Wilmington Credit Agreement (the "Term B Lenders"), (ii) executed two stalking horse asset purchase agreements, subject to higher or otherwise better bids, and (iii) agreed on procedures for a public bidding and auction process that will allow the Company to sell all or substantially all of its assets and maximize the value of the Company's remaining assets.  The RSA includes the Term B Lenders' support for each of the stalking horse bids and the public bidding and auction process, as well as a commitment for $150 million in debtor-in-possession financing (the "DIP Facility"), which will be used to refinance the debt under the BoA Credit Agreement and provide the funds necessary for the Debtors to finance these Chapter 11 Cases and consummate the sales contemplated under the RSA and the stalking horse bids.  The Term B Lenders have also agreed

to support an orderly wind-down of the Debtors' estates.  Following the execution of the RSA and the two stalking horse purchase agreements, the Debtors promptly commenced these Chapter 11 Cases.

## II.     The Debtors' Business and Operations

### A.     Overview of the Debtors' Business

13.     The original Sequential Brands Group, Inc. ("Old Sequential") was incorporated under the laws of the State of Delaware in 1982 as People's Liberation, Inc. and changed its name to Sequential Brands Group, Inc. in 2012.  Old Sequential's common stock began trading on the Nasdaq Capital Market under the ticker "SQBG" on September 24, 2013.  The current Sequential was formed in June 2015 in connection with the acquisition of Martha Stewart Living Omnimedia, Inc. ("MSLO"), which resulted in  Old Sequential and MSLO, becoming  wholly-owned subsidiaries of Sequential.[2]  Sequential succeeded to Old Sequential's listing on December 7, 2015.

14.     On June 10, 2019, Sequential completed the sale of MSLO for $166 million in cash consideration, plus additional amounts in respect of pre-closing accounts receivable received after the closing, subject to certain adjustments, pursuant to an equity purchase agreement with Marquee Brands LLC entered into on April 16, 2019.  In addition, the purchase agreement provided for an earnout of up to $40 million payable to Sequential if certain performance targets are achieved during the three calendar years ending December 31, 2020, December 31, 2021 and December 31, 2022.  The performance targets were not met for the year ended December 31, 2020 and it is unclear if such targets will be met for 2021 and 2022.

15.     As noted above, the Company owns a portfolio of consumer brands in the active and lifestyle categories.  Sequential's brands are licensed for a broad range of product categories,

---

[2]  MSLO and its subsidiaries were engaged in the business of promoting, marketing and licensing the Martha Stewart and the Emeril Lagasse brands through various distribution channels.

including apparel, footwear, fashion accessories and home goods. Sequential's business is designed to maximize the value of its brands through license agreements with partners that are responsible for manufacturing, selling, and distributing its licensed products.

16.     Sequential licenses brands to both wholesale and direct-to-retail licensees. In a wholesale license, a wholesale supplier is granted rights (typically on an exclusive basis) to a single or small group of product categories for a particular brand for sale to multiple accounts within an approved channel of distribution and territory. In a direct-to-retail license, a single retailer is granted the right (also typically done on an exclusive basis) to sell branded products in a broad range of product categories through its brick and mortar stores and e-commerce sites.

**B.      Description of Brands**

17.     The Debtors' license agreements typically require a licensee to pay royalties based upon net sales and, in most cases, contain guaranteed minimum royalties (i.e., a minimum amount that must be paid regardless of sales, referred to as "GMRs").  Certain of the Debtors' license agreements also require licensees to support the brands by either paying or spending contractually guaranteed minimum amounts for the marketing and advertising of the respective licensed brands. As of August 10, 2021, Sequential had contractual rights to receive an aggregate of approximately $189 million in minimum royalty and marketing and advertising revenue from its licensees through the balance of the current terms of such licenses (which run through 2027), excluding any renewals.  Sequential's brands include:

1)     **William Rast**

18.     The William Rast brand is a lifestyle fashion brand rounded in the iconography of biker culture with designs that embody the "new America" sensibility and deliver an edgy yet refined collection of apparel for both men and women. Product offerings include denim and

jewelry. Licensees for the William Rast brand include Omega Apparel for men's denim and Millennial Apparel Group for women's denim.  Distribution is concentrated through off-price retailers.

 2) **Joe's**

19.     Sequential acquired the Joe's brand in 2015.  Founded in 2001, Joe's is a premium denim and sportswear brand for men, women and kids. Concurrently with the acquisition, Sequential entered into a long-term license agreement for the brand's core categories with Centric Brands, Inc. ("Centric").  Joe's branded products are available at department stores and specialty boutiques in the United States and internationally and through Joes.com and related ecommerce sites.

 3) **Jessica Simpson**

20.     Sequential acquired a majority ownership interest in a joint venture entity that owns the Jessica Simpson brand in 2015. Founded in 2005, the Jessica Simpson Collection is a signature lifestyle brand. The brand offers multiple product categories including footwear, apparel, fragrance, fashion accessories, maternity apparel, girls' clothing and home products. The brand is supported by best-in-class licensees and has strong department store and online distribution through Dillard's, Macy's, Nordstrom, Zappos.com, and DSW, among other independent retailers. The joint venture has a license agreement with Camuto Group to manufacture and distribute footwear under the Jessica Simpson Collection.

 4) **SPRI**

21.     Sequential acquired the SPRI brand in July 2016 as part of the GAIAM transaction. Founded in 1983 as the Sports Performance Rehabilitative Institute, SPRI pioneered a line of rubber resistance products in the fitness & training category. Over the past 30 years, SPRI has

grown to offer a full line of fitness accessories, training tools and educational materials. The SPRI brand today focuses on distribution through the specialty sporting goods and mass market channels, as well as SPRI.com and related ecommerce sites.  In addition, the brand sells through commercial fitness channels (gyms, fitness clubs, and hotels).

5)   **GAIAM**

22.   Sequential acquired the GAIAM brand in 2016. Founded in 1996 as an eco-living catalog company, GAIAM evolved into a yoga brand by producing and distributing yoga videos and related products through multiple channels of distribution. GAIAM has since expanded to include a full line of apparel, yoga mats, yoga mat bags, yoga blocks and straps, yoga and fitness props, balance balls, bags, active sitting products, including our balance ball chair, fitness kits and various other accessories. GAIAM is dedicated to making yoga, fitness and wellness accessible to all through a wide distribution network, including the mass market, department stores, specialty and sporting goods stores, grocery and drug stores as well as GAIAM.com and related ecommerce sites.  Sequential currently licenses the GAIAM brand to various licensees, including Fit For Life LLC for yoga and wellness related hardgoods products, and High Life LLC for apparel.

6)   **Avia**

23.   Sequential acquired the Avia brand in 2014, which was founded in 1979 and is best known for running and activewear products designed to unite performance and function for athletes of every level.  Since Sequential acquired Avia, it has expanded its licensed product categories to include wearable fitness accessories, hosiery, sports bags and various other accessory products. The Avia brand is primarily offered through Wal-Mart stores in the United States, with additional distribution through specialty retailers, off-price retailers, and related e-commerce sites as well as globally in numerous countries.

7)   **AND1**

24.    Sequential acquired the AND1 brand in 2014, which was founded in 1993 and prides itself on being the original street basketball brand focusing on the everyday player. Key licensees for the AND1 brand include Galaxy Active LLC ("Galaxy Active") for footwear and High Life, LLC for apparel.  In addition, the AND1 brand is licensed in product categories such as basketballs and other accessories.  The AND1 brand is offered through Wal-Mart stores, specialty footwear and sporting goods stores, off-price retailers, and AND1 related e-commerce sites in the United States and Canada as well as certain international territories.

## C.    Corporate Headquarters

25.    During the fourth quarter of 2020, Sequential entered into lease termination agreements for three of its office spaces including its former corporate headquarters at 601 West 26th Street, New York, NY and sublease for this space.  Sequential's existing office located at 1407 Broadway, 38th Floor, New York, NY is the current headquarters.

## III.   Organizational and Capital Structure

26.    Sequential Brands Group, Inc. is a holding company, incorporated in Delaware, the principal asset of which is the capital stock of SQBG, Inc., a Delaware corporation that, along with its direct and indirect subsidiaries, operates the Debtors' businesses.

27.    Sequential conducts its operations through a network of affiliated companies that own the various brands comprising its businesses.  These companies are all directly or indirectly owned by Sequential Brands Group, Inc.  A copy of the Sequential organizational chart (the "Organizational Chart") is attached as Exhibit A.

28.    The chart below sets forth the Debtors' funded debt obligations as of the Petition Date:

| Debt Obligation | Original Principal Amount | Approximate Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|---|
| Revolving Loan | $130 million | N/A | 2023 | Secured |
| First Lien Term Loan A | $150 million | $102.28 million | 2023 | Secured |
| First Lien Term Loan A-1 | $70 million | $25.63 million | 2023 | Secured |
| Second Lien Term Loan | $314 million[3] | $298.50 million | 2024 | Secured |

## A.    Bank of America Facility

29.    Sequential and certain of its subsidiaries are party to that certain Third Amended and Restated First Lien Credit Agreement (the "BoA Credit Agreement"), dated as of July 1, 2016, with Bank of America, N.A., as administrative agent and collateral agent and the lenders (the "BoA Lenders") party thereto, which (as amended) consists of (i) Tranche A Term Loans  (the "Tranche A Loans"), (ii) Tranche A-1 Term Loans  (the "Tranche A-1 Loans" and, together with the Tranche A Loans, the "BoA Term Loans") and (iii) revolving credit commitments  (the "Revolving Credit Commitments" and, the loans under the Revolving Credit Commitments, the "Revolving Loans"). On the Petition Date, the total amount outstanding under the BoA Credit Agreement was $127.91 million, including (i) $102.28 million of Tranche A Loans and (ii) $25.63 million of Tranche A-1 Loans.

30.    On December 30, 2019, Sequential entered into that certain Third Amendment to the BoA Credit Agreement (the "Third BoA Amendment").  Pursuant to the Third BoA Amendment, the loans under the BoA Credit Agreement became subject to quarterly amortization payments of $2.5 million through September 30, 2020, $3.25 million through September 30, 2021 and $4 million for each fiscal quarter thereafter.  The Third BoA Amendment  also modified the calculation of Consolidated EBITDA (as defined in the agreement) and allowed certain netting of

---

[3]  As of the First Amendment Effective Date (as defined in the Wilmington Credit Agreement).  The original principal amount was $415,000,000.

cash for purposes of calculating the leverage ratio covenant.  The Revolving Credit Commitments were also reduced to $80 million.

31.     As described in more detail in Part V.B, on April 9, 2021, Sequential entered into a limited waiver to the BoA Credit Agreement (the "BoA Limited Waiver") which waived certain defaults and cross-defaults as described below.  On July 2, 2021, Sequential entered into another waiver (the "LTV Waiver") to the BoA Credit Agreement, related to the LTV Default (as defined below).  The LTV Waiver expires on August 31, 2021.

**B.     Wilmington Facility**

32.     Sequential and certain of its subsidiaries are party to that certain Third Amended and Restated First Lien Credit Agreement (the "Wilmington Credit Agreement"), dated as of July 1, 2016, with Wilmington Trust, National Association, as administrative agent and collateral agent and the lenders party thereto.  On August 7, 2018, Sequential entered into that certain First Amendment to the Wilmington Credit Agreement and made an $88.55 million prepayment under the Wilmington Credit Agreement, reducing the aggregate outstanding principal amount to $314 million.  On the Petition Date, the total amount outstanding under the Wilmington Credit Agreement was $298,467,625.

33.     On June 10, 2019, in connection with Sequential's sale of MSLO, Sequential entered into that certain Second Amendment to the Wilmington Credit Agreement.  On August 12, 2019, Sequential entered into that certain Third Amendment to the Wilmington Credit Agreement. Pursuant to the Third Amendment to the Wilmington Credit Agreement, no amortization of the loans under the Wilmington Credit Agreement was required through September 30, 2020, with quarterly amortization payments of $1.0 million commencing thereafter.  The Third Amendment to the Wilmington Credit Agreement also provided for a consolidated excess cash flow payment

holiday through December 31, 2020, modified the calculation of Consolidated EBITDA, and allowed certain netting of cash for purposes of calculating the leverage ratio covenant. Sequential also agreed not to borrow more than $30 million in Revolving Loans under the BoA Credit Agreement.

34.     On March 30, 2020, Sequential entered into that certain Fourth Amendment (the "Fourth Amendment") to the Wilmington Credit Agreement, which provides that after September 30, 2020, quarterly amortization payments would be $2.1 million, further modified the calculation of Consolidated EBITDA, and allowed certain netting of cash for purposes of calculating the leverage ratio covenant.

35.     As described in more detail below in Part V.B, on November 16, 2020, Sequential entered into that certain Fifth Amendment (the "Fifth Amendment") to the Wilmington Credit Agreement, which modified certain covenants and provided a waiver of certain defaults (the "Wilmington Waiver") through December 31, 2020 as further described below. The Company received incremental extensions of the Wilmington Waiver in the first, second, and third quarters of 2021. The current extension of the Wilmington Waiver expires on August 31, 2021.

**C.     Trade Debt**

36.     As of the Petition Date, the Debtors estimate that their unsecured debt is between $1.2 million and $1.4 million.

**D.     Securities Related Litigation**

37.     On December 11, 2020, the Securities and Exchange Commission ("SEC") filed a lawsuit (the "SEC Action") against the Company in the U.S. District Court for the Southern District of New York titled *Securities and Exchange Commission v. Sequential Brands Group, Inc.* The SEC alleges that the Company negligently delayed its goodwill impairment in the fourth

quarter of 2016 and first three quarters of 2017 at a time when the SEC asserts there was evidence

of likely impairment.  The SEC also alleges there were related deficiencies in internal accounting

controls.  The SEC Action seeks injunctive relief and civil monetary penalties. In February 2021,

the Company filed its motion to dismiss the complaint, which is fully briefed before the Honorable

Judge Oetken of the Southern District of New York, and is currently pending.

38.     On August 9, 2021, the SEC settled charges against the former CFO of Sequential

for causing Sequential's reporting, books and records, and internal controls violations related to

allegations that the Company failed to impair goodwill in a timely manner. Without admitting or

denying the allegations, Klein agreed to cease and desist from committing or causing violations of

any of these provisions and to pay a $20,000 penalty.  The SEC did not charge Klein with

negligently or otherwise misleading investors.  The SEC's findings were made pursuant to Klein's

Offer of Settlement and are not binding on any other person or entity, including the Company, in

any proceeding.

39.     On January 20, 2021, a shareholder derivative complaint, titled *Delmonico v.

Shmidman, et al.*, was filed in the U.S. District Court of Delaware.  The case names the Company

and certain of its current and former officers and directors as defendants.  The complaint alleges

breaches of fiduciary duties and violation of Section 14(a) of the Exchange Act. The allegations

in the complaint are based principally on the allegations in the SEC Action and the Company's

alleged failure to disclose such matters in its 2020 proxy statement. The plaintiff seeks, among

other things, injunctive relief and damages.

40.     On March 16, 2021, a class action lawsuit, titled *D'Arcy v. Sequential Brands

Group Inc. et al.*, was filed by a purchaser of the Company's securities, and prospectively on behalf

of all other purchasers of the Company's publicly traded securities between November 3, 2016

and December 11, 2020, in the U.S. District Court for the Central District of California.  The

complaint names the Company and certain of its current and former officers and directors as

defendants.  The complaint alleges violations of Section 10(b) and 20(a) of the Exchange Act. The

allegations in the complaint are based principally on the allegations in the SEC Action. The

plaintiff seeks, among other things, class certification and damages.  On August 20, 2021, the

parties filed a stipulation to transfer the venue to the United States District Court for the Southern

District of New York.

41.     On June 16, 2021, a shareholder derivative complaint, titled *D'Arcy v. Shmidman,*
*et al.*, was filed in the U.S. District Court of Delaware.  The case names the Company and certain

of its current and former officers and directors as defendants.  The complaint alleges breaches of

fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, corporate waste and

violation of Section 14(a) of the Exchange Act and contribution under Sections 10(b) and 21D of

the Exchange Act.  The allegations in the complaint are based principally on the allegations in the

SEC's complaint and the Company's alleged failure to disclose such matters in its 2020 proxy

statement.  The plaintiff seeks, among other things, injunctive relief and damages.  On July 1,

2021, *D'Arcy v. Shmidman, et al.* was consolidated by stipulation with *Delmonico v. Shmidman,*
*et al.*, into a single action titled, *In re Sequential Brands Group, Inc. Derivative Litigation*, C.A.

No. 21-c-60-CFC.

**E.      Equity**

42.     Sequential Brands Group, Inc. is the ultimate parent entity of each of the Debtors

and their non-Debtor affiliates, and is a publicly traded company that trades on the NASDAQ

under the symbol SQBG. Following the commencement of the Chapter 11 Cases, the Debtors

anticipate NASDAQ will immediately commence customary delisting proceedings with respect to

Sequential's common stock.  Once Sequential's common stock is delisted, Sequential intends to seek to deregister its common stock under the Securities Exchange Act.

43.     On July 27, 2020, Sequential's previously announced 1 share-for-40 shares (1:40) reverse stock split (the "Reverse Stock Split") of its outstanding common stock, par value $0.01 per share became effective.  The stated capital attributable to common stock on Sequential's consolidated balance sheet at December 31, 2019 was reduced proportionately to the Reverse Stock Split ratio, and the additional paid-in capital account was credited with the amount by which the stated capital is reduced.  As of close of market on August 27, 2021, there were approximately 394 holders of record of Sequential's common stock and Sequential's market capitalization was approximately $18.5 million.

## IV.     Events Leading to the Chapter 11 Cases

### A.     Impact of Revenue Declines and the COVID-19 Pandemic

44.     As noted above, the Company's revenues have been in decline since 2019.  The Company's net revenue decreased by $25.7 million to $101.6 million for the year 2019, compared to $127.3 million for the prior year.  The decrease was partially driven by licensee transitions, a licensee termination, lower contractual GMRs, and reduced wholesale sales year-over-year.  This trend continued in 2020, as the Company's net revenue further decreased by $11.8 million to $89.8 million.  While some of this decline was due to the economic impact of COVID-19, which caused supply chain disruptions for the Company's licensees as well as retail store closures, the Debtors' business faced additional challenges as detailed below.

45.     The Company's licensing revenues are concentrated with a limited number of licensees and retail partners.  During the year 2020, three licensees each represented at least 10% of net revenue, accounting for 19%, 18% and 15% of the Company's net revenue from continuing

operations.  The Company's revenue and cash flows are, therefore, dependent on these key licensees, creating a risk that the Company could be materially and adversely affected if any of these parties were to have financial difficulties affecting their ability to make payments, elected not to renew or extend any existing license agreements or arrangements, or significantly reduced their sales of these licensed products under their license agreements.

46.     In addition, the Debtors have sold the intellectual property underlying certain licenses according to their terms but have not generated sufficient revenue to replace them. Pursuant to some of the Debtors' license agreements, when a certain cumulative payment amount is met, the licensees may be entitled to purchase the underlying intellectual property for a nominal amount.  Other licenses have various options for the licensee to acquire the brands when certain metrics are met.  The Debtors' business model relies on being able to purchase additional licenses, brands and assets in order to replace certain licenses after the Debtors have sold the underlying intellectual property at the end of the licensed term.  As a result of declining revenues, however, it has been challenging for the Debtors to acquire additional brands to replace the brands they have sold.

**B.     Prepetition Restructuring Efforts**

47.     The Company recognized the revenue challenges it was facing by the third quarter of 2019.  Given these challenges, together with the Company's receipt of multiple unsolicited offers from third parties interested in acquiring certain of the Company's assets, the Company engaged Stifel on October 7, 2019 to perform a strategic alternatives business review, with a mandate that included, at the Company's determination, advice and assistance with the planning, execution, and closing of one or more sales.  This specifically included exploring the unsolicited offers, as well as initiating and coordinating discussions with potential purchasers and/or

participating in the negotiation of possible transactions and advising the Company as to negotiating strategy and other matters in connection therewith.

48.     Stifel began its evaluation of the Company and presented a strategic alternatives business review to the Board of Directors on October 28, 2019 as part of a regularly scheduled meeting.  The Board of Directors subsequently decided, in November 2019, to begin preparing for a sale of the Company's Assets.  From November 2019 to February 2020, Stifel and the Company worked to create marketing materials and a virtual data room for the marketing and sale of the Company's Assets.

49.     In addition to preparing broad marketing materials in late 2019 and early 2020, Stifel and the Board of Directors entertained conversations with selected high-priority parties, prior to the launch of the formal process.  This included three parties who showed a high degree of initial interest in certain material assets.  These parties were each granted access to the virtual data room and conducted diligence on these brands but, ultimately, in light of the circumstances and the Company's desire to launch a broader marketing process, the Company did not pursue a transaction with any of these parties at that time.

50.     The Company then launched a broader sale process in early March of 2020.  This included a wide ranging marketing outreach, with 93 parties contacted, teaser marketing information shared, and approximately 30 parties entering NDAs to conduct further diligence or remain involved in the process.  As noted above, however, this marketing process was occurring against the backdrop of the COVID-19 pandemic, which was further contributing to the Debtors' decline in performance.  Consumer fear and recommendations and/or mandates from federal, state and local authorities to avoid large gatherings (or self-quarantine) severely affected retailers, including the Company's licensees who sell to these retailers.  For the year 2020, the number of

retail stores that remained open was significantly reduced, and there was a marked change in consumer spending behavior.  These changes led to a reduction in orders from retailers bearing the Company's brands.  Unsurprisingly, this affected the Company's near-term and long-term revenues, earnings, liquidity and cash flows, including as a result of certain licensees requesting temporary relief or deferring making their scheduled payments.

51.     Nevertheless, the Company and its advisors continued to market the Company's assets over the spring and summer of 2020 and, in addition, undertook multiple processes to identify and engage with potential strategic parties for a value-maximizing business combination transaction.  This included significant engagement with a possible transaction counterparty over the course of early 2020, as well as the Company's submission of multiple non-binding letters of intent to purchase and/or combine with another significant industry party in the late summer and early fall of 2020.  Despite the best efforts of the Company and its advisors, the engagement with strategic transaction counterparties did not ultimately result in the consummation of a business combination transaction.

52.     Meanwhile, given the continual decline in historical revenue and the compounding effects of the COVID-19 pandemic, by the fourth quarter of 2020, the Company was in danger of breaching certain financial covenants in the Wilmington Credit Agreement.  As a result, in November 2020, the Company entered into the Wilmington Waiver under the Wilmington Credit Agreement with the Term B Lenders.

53.     The Wilmington Waiver provided for a waiver of certain specified events of default under the Wilmington Credit Agreement, including, relating to Sequential's (i) failure to deliver the audited financial statements for the fiscal quarter ended March 31, 2020, (ii) failure to deliver the Compliance Certificate for the Fiscal Quarter ended March 31, 2020, (iii)  failure to deliver the

updated report of the royalty revenue summary by brand and related licensing detail with respect to material licenses for the fiscal quarter ended March 31, 2020, (iv) failure to deliver the fourth amendment fee to the agent, for the benefit of the lenders, and (v) cross-defaults related to similar defaults under the BoA Credit Agreement.  The Company received incremental extensions of the Wilmington Waiver on December 31, 2020, January 31, 2021, February 21, 2021, March 10, 2021, March 31, 2021, April 19, 2021 (the "April 19 Waiver"),  May 10, 2021, May 25, 2021, June 7, 2021, July 8, 2021, and August 10, 2021.  The current extension of the Wilmington Waiver expires on August 31, 2021.  The April 19 Waiver also included a waiver of events of default related to the delivery of year-end 2020 financial statement and the Going Concern Default (as defined below).

54.     At the same time it entered into the Wilmington Waiver, the Company created the outline of a general sale process to sell all or substantially all of the Debtors' assets, with target dates for the Debtors to obtain indications of interest and final bids from potential purchases.  In fact, during this time, the Company continued to receive interest and engagement from potential asset acquirers, including receiving two non-binding indications of interest in November of 2020.

55.     In February 2021, the Company expanded the scope of the process to include Miller Buckfire & Co., LLC ("Miller Buckfire")[4] and to include services related to any financing or restructuring transaction, including, without limitation, identifying potential investors for any equity, equity-linked or debt securities, and any other financing opportunities.  In conjunction therewith, the Company expanded Stifel's mandate to include general advice and assistance in structuring and effecting a sale transaction.  The Debtors relaunched the broad strategic alternatives process as the effects of the COVID-19 pandemic began to subside in late 2020.

---

[4]   Both Miller Buckfire and Stifel are wholly-owned subsidiaries of Stifel Financial Corp.

56.     During this process, in late 2020 and early 2021, the Debtors' advisors contacted 168 parties with respect to a sale of some or all of the Debtors' assets, with over 135 parties receiving teasers, resulting in 47 parties entering into NDAs and receiving a full confidential information memorandum and process letter.  At the same time, the Debtors' advisors were also seeking alternative strategic transactions, including engaging in discussions with certain strategic parties regarding mergers or other business combination transactions.

57.     Additionally, to ensure that the Debtors were considering all potential opportunities, the Debtors' advisors also undertook a wide-ranging financing process, seeking to identify debt or equity-financed transactions that would sufficiently de-lever the Debtors' balance sheet and allow the Debtors to right-size their capital structure.  In February 2021, the Debtors' advisors contacted 12 financial parties regarding potential transaction structures; seven of these parties executed NDAs and received materials. Specifically, the Debtors were looking to refinance the Term B Lenders, given that Debtors had been operating under the Wilmington Waiver since November 2020.  Reception was limited overall; while all of the parties reviewed the opportunity in detail, the Debtors received only a proposal for an upsized first lien facility, with another party expressing tepid interest in a similar structure. Interest of these parties, as well as an additional institution, was resolicited in April, providing updated information, including 2020 financial results. None of the parties revised their interest or approach to the opportunity.

58.     Given the rapidly changing financing markets as the world began to further emerge from the depths of the COVID-19 pandemic, the Debtors' advisors re-launched the financing process in late May 2021. The Debtors' advisors identified 34 potential financing parties, two of which were involved in the Company's other strategic process at the time and five of which could be potential co-investors in a financing, if one were to be proposed and led by another institution.

The Debtors' advisors contacted the remaining 27 parties that could potentially serve as a lead source of financing, resulting in the execution of eight additional NDAs. These eight parties, along with four parties from the prior financing process, received updated marketing materials, a multi-year financial forecast and access to a dataroom. Reception during this process remained limited and, ultimately, the Debtors received only one preliminary financing proposal, subject to diligence. The preliminary financing proposal did not offer sufficient financing to fully refinance the Term B Lenders.  Because the preliminary financing proposal would not fully refinance the obligations under the Wilmington Credit Agreement, it would not sufficiently address the outstanding events of default thereunder.   As the Term B Lenders would not consent to a partial repayment, this rendered the preliminary financing proposal non-actionable from the Company's perspective.

59.    While the Debtors' advisors continued to undertake the marketing and financing processes and engage with all potential transaction counterparties, the Debtors' also began to develop more meaningful discussions with their key stakeholders, including, specifically, the Term B Lenders.   The Debtors and the Term B Lenders participated in extensive arm's length negotiations surrounding the structure of potential solutions to the Debtors' capital structure, including through a sale of core assets in the Company's active division to a third party buyer.

60.    On January 20, 2021, the Debtors received a letter of intent from Galaxy Universal LLC ("Galaxy Universal"), a subsidiary of Gainline Galaxy Holdings LLC ("Galaxy") for the purchase of the Company's active division brands and related assets (the "Active Division Assets").  The proposed purchase price was $270 million, which was to be paid in cash, and did not specify Galaxy's financing sources.  Despite this letter of intent, the Debtors' advisors continued to engage with other parties related to a sale of the Debtors' assets, including structures that focused on a sale of (i) the Active Division Assets, (ii) all of the Debtors' Assets, and/or (iii)

various combinations of the Debtors' Assets.  As such, the Debtors continued to pursue all viable options and engage with all potential parties to identify value-maximizing transactions.

61.     After further negotiation with the Debtors' advisors, the cash purchase price in the Galaxy LOI increased to $310 million by January 29, 2021 but negotiations then stalled as the Debtors and their advisors worked to try to deliver more value for the Active Division Assets or the Company's assets as a whole.  In March and April 2021, the Term B Lenders began to engage with the Debtors and Galaxy to develop a transaction structure by which the Term B Lenders would provide attractive financing to Galaxy in order to help increase the value of the transaction structure.  Ultimately, with Term B Lender financing included in the proposal, the Galaxy purchase price for the Active Division Assets increased to $333 million.  On April 28, 2021, the Debtors entered into a non-binding letter of intent (the "Galaxy LOI") with Galaxy Universal to purchase the Company's Active Division Assets for a purchase price of $333 million (subject to certain adjustments, including related to the purchase of certain related accounts receivable).[5]

62.     Shortly thereafter, on May 7, 2021, the Debtors also entered into a non-binding letter of intent with a third party to purchase the Joe's Jeans and Caribbean Joe brands.  However, on June 17, 2021, the Debtors allowed the exclusivity period in this third party's letter of intent to expire, as the Debtors' advisors determined that there were other parties desiring to engage in a potential purchase of these brands.  Still, the Debtors continued conversations with this third party with the goal of maximizing the purchase price for these assets.  Ultimately, on July 23, 2021, the Debtors entered into a non-binding letter of intent (the "Centric LOI") with Centric for the Joe's Jeans brand, for a total purchase price of at least $42 million (subject to certain adjustments), comprised of (i) $38.25 million payable upon closing of the transaction and (ii) for each of the five

---

[5]  Galaxy, the parent entity of Galaxy Universal, is the signatory to the Galaxy APA (as defined below) and will serve as the Galaxy Stalking Horse Bidder (as defined below).

consecutive years following the closing of the transaction, an annual cash payment equal to 1.0%
of Net Wholesale Sales[6] for the applicable year, subject to a minimum payment of $750,000 per
year.  As noted above, Centric is the current licensee for the Joe's Jeans brand.

63.     As the Debtors were working to negotiate the letters of intent, on April 9, 2021, the
Company entered into the BoA Limited Waiver (and a limited waiver to the Wilmington Credit
Agreement) which waived defaults related to the Company's (i) failure to deliver audited financial
statements for the fiscal year ended December 31, 2020, (ii) failure to deliver the certificate of its
registered public accounting firm for the fiscal year ended December 31, 2020, (iii) failure to
deliver a compliance certificate for the fiscal year ended December 31, 2020, and (iv) cross-
defaults related to each of the foregoing.  On April 15, 2021, the BoA Limited Waiver was
modified to include a permanent waiver related to the inclusion of  a going concern qualification
in the audit opinion delivered by Sequential's independent registered public accounting firm with
respect to the Company's annual audited financial statements for the year ended December 31,
2020 ("Going Concern Default").  After obtaining a waiver of the Going Concern Default, the
Company filed its form 10-K for the year ended December 31, 2020.  On May 25, 2021, Sequential
entered into separate limited waivers under the BoA Credit Agreement (and the Wilmington Credit
Agreement) related to the failure to (i) deliver financial statements for the fiscal quarter ended
March 31, 2021, (ii) deliver the compliance certificate for the fiscal quarter ended March 31, 2021,
and (iii) related cross-defaults.

64.     As the Debtors and their advisors continued to engage with bidders for the assets
and other transaction counterparties, on June 11, 2021, the Company became aware that, as a result

---

[6]  "Net Wholesale Sales" has the meaning ascribed in the Joe's Jeans Sportswear and Jeanswear License between
Sequential Brands Group, Inc. and Centric West LLC (as successor to GBG USA Inc.), dated as of September
1, 2015, as amended.

of an updated appraisal of the trademarks, trade names and certain other intellectual property, it was no longer in compliance with the loan to value ratio financial covenant ("LTV Covenant") set forth in the BoA Credit Agreement (the "LTV Default").  On June 17, 2021, the Company and the BoA Lenders agreed to a temporary waiver (the "June 17 Waiver") that extended the terms of the BoA waiver entered into on May 25, 2021 and also included a waiver of the LTV Default through June 23, 2021.

65.     After further negotiations between Sequential and the BoA Lenders, Sequential ultimately entered into the LTV Waiver, which extended the terms of the June 17 Waiver and waived the LTV Default through August 10, 2021.  Pursuant to the LTV Waiver, Sequential was required to, among other things, (i) apply cash on the balance sheet in excess of $11 million to pay down outstanding obligations under the BoA Credit Agreement on a weekly basis, (ii) deliver weekly cash flow forecasts to BoA, and (iii) pay a 1.0% waiver fee, unless the Term B Lenders have delivered a fully underwritten commitment (the "DIP Commitment") sufficient to repay the obligations under the BoA Credit Agreement in full in cash by August 10, 2021.  The Term B Lenders provided the DIP Commitment by August 10, 2021, the 1.0% waiver fee was not required to be paid, and the LTV Waiver was subsequently extended to August 31, 2021.

66.     The Debtors were ultimately in default, and operating under temporary waivers, under both the BoA Credit Agreement and the Wilmington Credit Agreement.[7]  Additionally, the LTV Waiver was temporary, forcing the Debtors to conclude both the sale process and the financing process in order to choose a path and proceed expeditiously before the waiver period expired.  Further, the terms of the LTV Waiver put pressure on the Debtors' liquidity and forced

---

[7]   The Debtors were ultimately able to get back in compliance with the LTV Covenant prior to the Petition Date by using proceeds from certain of the Pre-Bankruptcy Sales to paydown obligations under the BoA Credit Agreement.  Nevertheless, the Debtors continued to be in default under other provisions of both the BoA Credit Agreement and the Wilmington Credit Agreement.

the Term B Lenders to come to the table with a temporary financing solution to avoid additional cash leakage.  As a result, the Debtors' liquidity profile became severely constrained and the Debtors filed these Chapter 11 Cases with only approximately $100,000 of cash on hand.

**C.    Pre-Bankruptcy Marketing and Sales**

67.    In addition to entry into the Galaxy LOI and the Centric LOI, as a result of a robust marketing process led by Stifel, the Company was able to reach an agreement and consummate the sale of certain brands prior to the Petition Date (collectively, the "Pre-Bankruptcy Sales"). Certain of the proceeds of the Pre-Bankruptcy Sales were used to paydown obligations under the BoA Credit Agreement.

68.    On April 21, 2021, the Company entered into an asset purchase agreement between Heeling Sports Limited, a wholly-owned indirect subsidiary of Sequential, and BBC International LLC ("BBC International"), pursuant to which the Company sold BBC International the Heely's intangible assets for $11 million in cash consideration. The sale closed on April 21, 2021.

69.    On July 19, 2021, Sequential entered into an asset purchase agreement with Elan Polo International, Inc. ("Elan Polo"), pursuant to which Sequential agreed to sell its 65% interest in the DVS brand to Elan Polo for $2.0 million in cash consideration. The sale closed on July 19, 2021.

70.    On July 30, 2021, the Company entered into an asset purchase agreements between (i) Brand Matter, LLC ("Brand Matter"), a wholly-owned indirect subsidiary of Sequential, and Ellen Tracy Holdings, LLC ("ET Holdings") and (ii) Brand Matter and Caribbean Joe Holdings, LLC ("CJ Holdings" and, together with ET Holdings, "Capelli"), pursuant to which the Company sold Capelli the Ellen Tracy and Caribbean Joe brands for $17 million and $3 million in cash consideration, respectively. Both sales closed on July 30, 2021.

**D.      Restructuring Support Agreement**

71.      In order to file these Chapter 11 Cases with a clear path forward, the Debtors and their advisors finalized and entered into a restructuring support agreement ("RSA") with the Term B Lenders on  August 31, 2021.  In conjunction therewith, the Debtors entered into purchase agreements with Galaxy (the "Galaxy APA") and Centric (the "Centric APA"), respectively, to serve as stalking horse bidders.

72.      The RSA establishes a clear and reasonable framework—with the necessary financing—for the Chapter 11 Cases, and provides that the Debtors will initiate a value-maximizing sale process for the sale of the Active Division Assets, the Joe's Jeans brand, and the Additional Assets which will provide third parties with the ability to provide higher and/or better bids, subject to the milestones in the RSA.  The Debtors will ultimately sell all or substantially all of their assets to the stalking horse bidders or one or more third party purchaser(s) determined to have submitted the highest or otherwise best offer in accordance with the Bidding Procedures (as defined below).  Further, the RSA includes an agreement for certain of the Term B Lenders to provide up to $150 million in debtor-in-possession financing ("DIP Facility") during the Chapter 11 Cases and the use of cash collateral to allow the Debtors to bridge through the sale process and provide the Debtors with the liquidity they need to successfully navigate the Chapter 11 Cases.

73.      As noted above, (i) Galaxy will serve as stalking horse bidder (the "Galaxy Stalking Horse Bidder") for the Active Division Assets and (ii) Centric will serve as stalking horse bidder (the "Centric Stalking Horse Bidder") for the Joe's Jeans brand.  Further, pursuant to the term sheet attached as Exhibit C to the RSA (the "Plan Term Sheet"), the Term B Lenders may credit bid for the Debtors' remaining brands (collectively, the "Additional Assets")—via a credit bid of their prepetition loans under the Wilmington Credit Agreements.

74.     Despite the challenge and uncertainty created by the Debtors' declining revenue, the nature of the assets, and the COVID-19 crisis, the Debtors believe that the RSA, coupled with the asset sales thereunder, provides the best presently available opportunity to ensure value is maximized for the benefit of all stakeholders.  In addition, the Debtors believe that the sale process contemplated by the RSA will ensure that there is adequate opportunity to determine if higher or otherwise better alternatives to the contemplated stalking horse bids are available.

75.     Prior to the Petition Date, entry into the RSA was approved by the Board of Directors, which adopted resolutions to enter into the RSA.  As described in detail above, this decision was made after the Company and its advisors exhaustively evaluated and pursued alternatives with other key stakeholders and third parties over a period dating back to 2019. Following the execution of the RSA, the Debtors promptly commenced these Chapter 11 Cases to expeditiously implement the value maximizing sales.  Contemporaneous herewith, the Debtors have filed proposed bidding and sale procedures (the "Bidding Procedures") which provide flexibility for the Debtors to continue to market all of their assets during the Chapter 11 Cases, including the Active Division Assets, the Joe's Jeans brand, and the Additional Assets, in either individual lots (by brand and/or by division or any other combination) or as a collective whole.

76.     The RSA provides for the following key milestones for the sale process:[8]

| Event | Timeline |
|---|---|
| Deadline for entry of Bidding Procedures Order | 23 calendar days following the Petition Date |
| Qualified Bid Deadline | 55 calendar days following the Petition Date |
| Date of Auction | 60 calendar days following the Petition Date |
| Deadline for entry of Sale Approval Order | 65 calendar days following the Petition Date |
| Deadline to close Sale | 75 calendar days following the Petition Date |

---

[8]  The Debtors are not seeking approval of the Bidding Procedures at the first day hearing.

E.      **Key Employees**

77.      The Debtors operate with a very lean employee base, employing a total of 19 employees.  As the Company worked through its strategic process, it became clear that (i) the Company was going to be asking significantly more of its employees than it had required in the past and (ii) that the loss of any of its employees could significantly hamper the Company's ability to maximize value for all of its stakeholders.  Accordingly, prior to the Petition Date, the Board of Directors conducted a comprehensive review of the Company's compensation program for certain key employees.  After reviewing market data and benchmarking, on May 12, 2021, the Board of Directors approved certain incentives to be paid to 13 of its employees in order for the Debtors to ensure they could complete their value-maximizing sale process.  Aggregate payments under this program included $3,156,110.

## VII.    Evidentiary Support for First Day Motions[9]

78.      Concurrently with the filing of their chapter 11 petitions, the Debtors have filed certain First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate in these Chapter 11 Cases with minimal disruption and loss of productivity.  The Debtors respectfully request that the relief requested in each of the First Day Motions be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.  I have reviewed each of the First Day Motions. All of the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the

---

[9]  Capitalized terms used but not otherwise defined in this Section VII shall have the meanings ascribed to such terms in the applicable First Day Motion.

Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.   A summary of the relief requested in each First Day Motion and the facts supporting each First Day Motion is set forth below.   The First Day Motions (each as described in more detail below) include:

78. *Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

79. *Debtors' Application for Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective Nunc Pro Tunc to the Petition Date* (the "156(c) Application");

80. *Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms; (B) Authorizing Continuation of Existing Deposit Practices; (C) Authorizing Continuation of Intercompany Transactions; (D) Granting Priority Status to Postpetition Intercompany Claims; (E) Authorizing the Debtors to Open and Close Bank Accounts and (F) Granting Related Relief* (the "Cash Management Motion");

81. *Debtors' Motion Seeking Entry of Interim and Final orders (I) Authorizing the Debtors to (A) Continue Employee Compensation and Benefits Programs and (B) Pay prepetition claims related Thereto and (II) granting related relief* (the "Employee Wage Motion");

82. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "Tax Motion"); and

83. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Adequate to Prepetition Secured Parties; (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").

**A.   Joint Administration Motion**

79.   In the Joint Administration Motion, the Debtors request entry of an order providing for the joint administration of the Chapter 11 Cases for procedural purposes only.   Specifically,

the Debtors request that the Court direct procedural consolidation and joint administration of their related Chapter 11 Cases.

80.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each and every Debtor entity.  The entry of an Order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee ("U.S. Trustee") and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

81.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      The 156(c) Application**

82.     In the 156(c) Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") as their Claims and Noticing Agent in the Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.  It is my understanding that the Debtors' selection of KCC to act as the Claims and Noticing Agent has satisfied this Court's protocol for the Employment of Claims and Noticing Agents under 28 U.S. C. § 156(c), in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure

selection through a competitive process.  Moreover, I submit, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.  Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be several hundreds to thousands of entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

**C.**     **The Cash Management Motion**

83.     In the Cash Management Motion, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks and business forms; (ii) authorizing, but not directing, the Debtors to continue their existing deposit practices; (iii) granting the Debtors a 30-day extension of the time by which they must comply with section 345(b) of the Bankruptcy Code, solely to the extent the U.S. Trustee wishes to review the Debtors' bank accounts to ensure compliance therewith; (iv) authorizing, but not directing, the Debtors to continue performing intercompany transactions; (v) granting priority status to intercompany claims arising from certain of those transactions; (vi) authorizing the Debtors to open and close bank accounts; and (g) granting related relief.

84.     8. In the ordinary course of business, the Debtors maintain a complex, centralized cash management system (the "Cash Management System"). The Cash Management System ensures the Debtors' ability to effectively and efficiently monitor and control their cash position and is managed by the Debtors' financial personnel. The Cash Management System benefits the Debtors' day-to-day operations by providing an ability to, among other things,

(i) quickly track, monitor and control corporate funds, (ii) ensure cash availability and prompt payment of corporate, employee, and vendor related expenses, (iii) reduce administrative costs by facilitating the efficient movement of funds and (iv) track intercompany cash.  A diagram of the Cash Management System with account-specific information is attached to the Cash Management Motion as Exhibit C.

85.     The Cash Management System has been employed by the Debtors for a number of years and constitutes an ordinary course, essential business practice. The Cash Management System is also a vital component of the Debtors' operations and beneficial to their estates and creditors because it enables the Debtors to (i) transfer funds in the most cost-effective manner, (ii) maintain accurate information regarding receipts, account balances and disbursements, and (iii) ensure compliance with the Company's comprehensive accounting and disbursement oversight procedures.

86.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest.  Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**D.     The Employee Wage Motion**

87.     In the Employee Wage Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to (i) maintain, modify and discontinue their employee, contractor and director Compensation and Benefits in the ordinary course of business during these

chapter 11 cases without the need for further Court approval, and (ii) pay and honor prepetition claims related to the Compensation and Benefits Obligations in the ordinary course of business.

88.     The majority of the Employees and Contractors rely on the Compensation and Benefits to satisfy their daily living expenses and, oftentimes, important healthcare needs, among other things.  Consequently, the Workforce will be exposed to significant hardship and potentially negative health outcomes if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits.  Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

89.     Moreover, the Workforce provides the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent payment of the Compensation and Benefits Obligations, the Debtors may experience turnover and instability at this critical time. The Debtors believe that without these payments, the Workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees and Contractors may face.  Indeed,  such Employees could elect to seek alternative employment opportunities.  Additionally, a large portion of the value of the Debtors' business is integrally supported by their Workforce, which cannot be replaced without significant efforts— efforts that might not be successful given the overhang of these chapter 11 cases.  Enterprise value, as well as the value of the Debtors' individual brands, may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that payment of the Compensation and Benefits Obligations is a necessary and critical element of the Debtors' efforts to maximize value for the benefit of all stakeholders.

90.     The relief requested in the Employee Wage Motion is essential for the Debtors to be able to maintain employee morale and for the survival of the Debtors during the Chapter 11 Cases.  Accordingly, I believe that the Debtors must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to pay the Compensation and Benefit Obligations.

91.     Accordingly, for the reasons set forth herein and expanded on in the Employee Wage Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

E.     **The Tax Motion**

92.     In the Tax Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, to remit and pay Taxes and Fees without regard to whether such obligations accrued or arose before or after the Petition Date, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date.

93.     In the ordinary course of business, the Debtors collect, incur, and pay franchise tax, excise tax, business and occupancy tax, commercial activities tax, personal and real property tax, income tax and commercial rent tax, along with various other taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing authorities (collectively, the "Authorities").

94.     The Debtors seek authority to pay all Taxes and Fees assessed by the Authorities with respect to the prepetition period, including those Taxes and Fees that (i) accrued prepetition but were not paid in full as of the Petition Date, or (ii) were incurred, in whole or in

part, with respect to the prepetition period but which will not come due until after the Petition Date.  In addition, for the avoidance of doubt, the Debtors seek authority to pay Taxes and Fees accrued or incurred postpetition and Taxes and Fees for so-called "straddle" periods.

95.      Any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including that: (i) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that would harm the estates; (ii) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring; and (iii) failing to pay certain of the Taxes and Fees may result in penalties, the accrual of interest, or the Debtors losing their ability to conduct business in certain jurisdictions.

96.      Accordingly, for the reasons set forth herein and in the Tax Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and creditors because it will enable the Debtors to continue to operate their businesses while the Chapter 11 Cases are pending.

## F.      **The DIP Motion**

97.      In the DIP Motion, the Debtors seek entry of an order, *inter alia*, (a) to obtain postpetition financing consisting of a $150 million loan, of which approximately $141 million will be available immediately upon entry of an interim order, (b) authorizing entry into the DIP Loan Documents, (c) authorizing the use proceeds of the DIP Facility and Cash Collateral in accordance with the Budget, (d) granting DIP Liens, (e) authorizing payment of principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Loan Documents, (f) granting superpriority administrative expense claims, (g) approving the Adequate Protection Package, and (h) granting related relief.

98.     The DIP Facility is fair and reasonable. Of note, proceeds of the DIP Facility will be used, among other things, to refinance all of the Prepetition BAML Obligations.  This feature is critical, as the Prepetition BAML Lenders were unwilling to be primed by the DIP Facility.  The economics of the DIP Facility are such that the refinancing is cost-neutral to the estates, (and may, in fact, provide savings to the Debtors' estate compared to a DIP Facility without a refinancing mechanism), and obviates the need for a value-destructive and time-consuming priming fight with the Prepetition BAML Lenders.  In addition, the Prepetition Term B Lenders also are fully supportive of the DIP Facility, including the imposition of priming liens associated therewith.  The DIP Loan Documents are the result of (i) the Debtors' reasonable judgment that the DIP Lenders provided the best (and only) postpetition financing alternative available under the circumstances and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.

99.     The DIP Facility will allow the Debtors to conduct the asset sales contemplated in the RSA and expeditiously pursue confirmation of a chapter 11 plan.  The Debtors' ability to remain a viable operating entity until the time of its sale depends on obtaining the interim and final relief requested in the DIP Motion.  As of the commencement of these Chapter 11 Cases, the Debtors will have only approximately $100,000 of cash on hand.  Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Thus, the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of the Chapter 11 Cases.

Dated: August 31, 2021                    /s/ Lorraine DiSanto
                                          Lorraine DiSanto
                                          Chief Financial Officer
                                          Sequential Brands Group, Inc.